### McCANN v. WALLACE.

#### (Circuit Court, D. Oregon. September 12, 1902.)

#### No. 2,672.

1. MINES—INJUNCTION AGAINST FLOWAGE OF LANDS—GROUNDS.

     Plaintiff brought suit to enjoin defendant from discharging the water used in operating a placer mine, brought through a tunnel by defendant, into an artificial creek or ditch which flowed through plaintiff's farm and which was in some places higher than the adjacent land, alleging damage from subirrigation and overflow, and the deposit of mining débris on the land. The preponderance of evidence was against the claim of injury from subirrigation, and tended to show that the ditch, if kept in proper repair, was sufficient in size to carry the water from the mine in addition to the natural flow therein at ordinary stages without overflowing, and it was shown that defendant had offered to build levees where necessary and to keep the ditch in repair through plaintiff's land, but that plaintiff refused to permit it. It was also shown that he made no objection while defendant was expending a large sum in constructing the tunnel to bring the water to his mine. *Held*, that plaintiff had no equity upon the facts shown which entitled him to an injunction.

In Equity. Suit for injunction. On final hearing.

Wm. M. Colvig and George H. Durham, for complainant.

Robert G. Smith and Williams, Wood & Linthicum, for defendant.

BELLINGER, District Judge. This is a suit to restrain the defendant, in the operation of a placer mine, from damaging plaintiff by flowing water over his land and depositing mining débris or

slickens thereon.    Since the commencement of the suit the mine complained of has been sold to the Althouse Mining Company, and the company is in fact the real party in interest.

The water used in the operation of the mine in question is taken from Althouse creek by means of a tunnel through a divide that separates the waters of that creek from Democrat creek.    The amount of water so taken is some 2,000 inches, miners' measurement. Below the mine defendant has built a slum dam 216 feet long.    This dam is built by driving piling, six feet apart, and planking the same on the inside with 2-inch plank, 12 feet long, put down close.    The piles are from 10 to 12 inches in diameter and 20 feet long.    They are driven in the ground so that they protrude above it 10 feet.    The water flowing over this dam spreads over a flat thickly covered with willows to a width of some 300 or 400 feet for a distance of from 800 to 1,000 feet, where it is taken up by Democrat creek or gulch, a part of it by means of an intersecting ditch.    The point where this overflow reaches Democrat creek is about half a mile above plaintiff's land.    This creek, or gulch, runs on a line, straight or nearly so, through plaintiff's land for a distance of about a mile.    This ditch is artificially made, and is higher than some of the adjacent land. It has a fall of some 14 or 16 feet in going through the land in question.    One of plaintiff's witnesses, testifying from actual measurement, gives the width of Democrat gulch through plaintiff's premises at from 10 to 11½ feet, and the depth at from 3 to 5 feet.    It is intersected by Mulvaney's gulch a little below the center of plaintiff's tract.    This gulch is used mainly as an irrigating ditch.    In high water it carries as much or more water than Democrat creek.    Defendant's mine was first operated by water from Althouse three years ago.    Prior to that time for many years mining operations had been carried on on a small scale above plaintiff's farm, and the débris carried into Democrat gulch.    Probably the extent of such mining altogether was about equal to that done by the defendant in the three years that the mine complained of has been in operation.

Plaintiff's land consists of 425 acres, of which he owned 320 acres at the commencement of this suit.    Something over 200 acres is what would be called level land, over half of which has been cleared. The remainder is brush land, that has once been cleared, but has grown up again with brush.    Of the land in cultivation, 50 acres are devoted to raising timothy hay, 15 to alfalfa, 4 to natural grass, and from 15 to 25 to wheat, oats, barley, and potatoes.    This land lies on either side of Democrat gulch.    Plaintiff testifies that it is pretty good land, and that he paid $3,500 for it 11 years ago.    There is testimony tending to prove that its present value is about $10,000.

The complaint is that mining débris is carried in the water from defendant's mine, and is filling up the channel of Democrat gulch so that it is being carried over the sides of such channel and deposited on plaintiff's land, and that the water flowing from the mine into Democrat gulch is more than the channel can carry, and as a result it spreads out over plaintiff's meadow and other land, rendering them boggy and unproductive and impossible of cultivation. Plaintiff testifies that when the creek is full of water it overflows his

land on the north side out from the creek for a distance of four. or five hundred yards, covering 25 acres of meadow; that on the other side the overflow will extend about 300 yards; that when the mine tunnel is run full of water his land subirrigates, and is so wet that he cannot plow it, and sour grass comes up on the meadow where the water stands; that the mine is usually operated from about the middle of November to the 1st of May; that the deposit on the land is sand and slickens; that since the mine has been operated this deposit has accumulated to an average depth of from 1 to 8 inches, and that the land so affected comprises 8 or 10 acres. On cross-examination, in answer to the question, "You say 25 acres are covered with slickens?" the plaintiff answered, "Yes." In fact he had not so stated. What he had stated was that on one side of the ditch 25 acres had been flooded with water. Further on in his cross-examination he testified that about 5½ acres are covered from 8 to 15 inches deep, and that the rest of the 25 acres have "little rises in spots." He further testified on his cross-examination as follows: "How much of that (the meadow) is covered with them (slickens)? A. Nearly all covered where the water went through. Q. Covered with slickens? A. Six, eight, or ten acres." The witness explains that this refers to the timothy meadow. He testifies that there are four acres of natural grass land affected, and something "over an acre on the other side,"—a total of from 10 to 15 acres; that he cleared the brush out of the channel of Democrat creek and repaired the banks; that since the operation of the mine the banks of the channel have been flooded off and the levee built by him washed out, and the work of keeping the channel in repair increased to the amount of $40 or $50 a year; that it is not possible to control the flow of water through this channel when the mine is being operated; that the débris fills up the channel, and when this is cleared out it will fill up again in two days.

Patton, a brother-in-law of plaintiff, and Maurer, a neighbor, testify that between 15 and 25 acres of plaintiff's land have been affected by débris. Croxton, another witness for plaintiff, places the amount of land affected at 10 or 15 acres. Carson testifies that between 30 and 40 acres are affected, and that the débris will eventually destroy the land entirely. This witness produced samples of the slickens taken from plaintiff's land. He has débris litigation himself, and came from Grant's Pass, some 35 or 40 miles distant, where he resides, for the purpose of examining plaintiff's land so as to testify as a witness. Lovelace testifies that there was quite a territory of it, land flowed over, with débris. Morey, a witness for plaintiff, testifies that "there have been several acres of McCann's land" covered more or less with fine gravel and sediment. George, another witness for plaintiff, testifies that the value of plaintiff's land is from $8,000 to $10,000, and that the continued operation of the mine is liable to do the land great damage. One of defendant's witnesses, J. E. Holland, testifies that he examined plaintiff's land; that he saw a little sediment or sand, not enough to amount to anything; saw some slickens; but that the operation of the mine will be some damage to plaintiff's land. On the other hand, 12 witnesses, farmers, miners and others,

without interest in the controversy, testify in effect that there are no slickens or other débris upon plaintiff's land in quantities to injure or affect it. Thirteen other witnesses, who are, with two exceptions (one that of a small stockholder and the other that of Mr. Rourke, who owns a mine on Althouse), miners in the company's employment, testify to the same thing. There is also testimony to the effect that neither the ground worked by defendant, nor that of the Rourke mine on Althouse, from which stream the water used in defendant's mine is taken, contains slickens, or the clay from which they are produced, in any considerable quantity.

Witnesses for both parties testify to the existence of a break in the ditch or channel of Democrat creek on the south side, some 19 feet in width, through which water was pouring on the day the witnesses examined the land as to its condition.

Several of the witnesses for the defendant testified to a particular examination of the channel of the creek with reference to any deposit of sand or slickens therein, and these witnesses testify that the ditch or channel was clean; that there was no accumulation of sediment of any kind. Such testimony is free from the difficulty that attends opinion evidence. Witnesses are not likely to be mistaken about a fact so palpable and easily known; and it is a safe assumption in the case that the flow of the water in the channel of Democrat gulch is not impeded by deposits of débris from the mine, and, if not, there ought to be little trouble in maintaining a channel that will carry the flow of water from the mine at all times, except during periods of flood, and at such times it appears that the mine is not operated. The superintendent of the mine testifies that a ditch eight feet wide and five deep, with a grade of three-fifths of an inch to the mile, will carry about 9,000 inches of water, miners' measurement,—four and one-half times as much water as defendant's mine uses. This is a fact which admits of exact information; the formula for this measurement is given, and there is no dispute about it. Hansen, the former owner of defendant's mine, testifies that, when there is no storm, Democrat creek carries about 25 inches of water. The plaintiff testifies that he has seen it with as much water as comes through the defendant's tunnel. This was presumably during extreme high water. The creek rises and falls suddenly. It will fall from the freshet stage to ordinary water in "a day or two." The present dimensions of the creek through plaintiff's place, according to his testimony, are as follows: Width 10 feet, average depth 2½ feet. George, a witness for plaintiff, called to testify to the dimensions of the channel from measurements made by him, gives the narrowest measurement at 10 feet and the minimum depth at 3 feet. From these dimensions there can be no question but that the ditch, when in repair, will carry the water used in the mine and the creek water during ordinary winter stages. According to King, the superintendent of the mine, the grade of this ditch is as great as is desirable in ditches of that size.

While there will be subirrigation from such a ditch, yet I am convinced that the flooding complained of is not the result of subirrigation, but of breaks in the ditch through want of repair. It is a matter of common knowledge that mining and irrigating ditches are success-

fully maintained in Southern Oregon and Northern California, and that they are common throughout that region. It is in itself extremely improbable that plaintiff's farm is so exceptional in its character that water cannot be carried through it by means of a ditch. During March and April, and earlier, at the time the witnesses in the case examined this farm, much water was running out of Democrat gulch through a sluice in the side of the channel already mentioned. This break could have been easily repaired. The wet and boggy condition of the adjacent land, if it was in that condition, indicated nothing as to the extent of subirrigation from the broken ditch.

Before starting the mine, the superintendent offered to levee all the low places on plaintiff's land so that the water could not get out of the ditch, and offered to pay $50 per acre for the land occupied by the ditch, but both these offers were refused, and the plaintiff testifies that he would not permit the defendant to repair the ditch through his land. The question which elicited this answer was objected to by his attorney upon the ground, among others, that such permission, if granted, would enable the defendant in the course of time to acquire a right to do so. The plaintiff afterwards, in answer to a question, said that if the defendant should waive any right acquired by such permission, still he would not allow the defendant to make repairs. Thereafter he testified that the reason why he would not permit such repairs or other work along the creek by defendant was that the defendant's mine "has such a very large water power that they themselves cannot control it at times." Neither of these reasons is a reason. A right that is exercised in plaintiff's interest and for his protection can never be adverse; and if there is anything to justify an opinion that the 2,000 inches of water employed by the mine, added to the usual flow in Democrat gulch, with the mine shut down in periods of freshet, would at times get beyond defendant's control, the plaintiff could not be injured by such control as it is possible for defendant to keep under the circumstances. And, as already appears, if Democrat gulch is put in a state of good repair, it will take care of the water which it is required to carry, without injury to plaintiff. The attitude of plaintiff is uncompromising. It involves the destruction of the defendant's mining property, representing an investment of more than $30,000. He saw the work of building the tunnel by defendant, through which the water to be used in the mine was to be brought from Althouse creek, go on at great expense, and said nothing until the work was completed, and thereupon he appeared with a witness and forbade the operation of the mine. He now says that he thought that a dredge was to be used, and that this water would not be turned into Democrat gulch. After having delayed making objection until the defendant's position became irretrievable, he ought to be willing now to give the defendant the opportunity to repair, and, if it so desires, improve Democrat gulch, so that it may be known from actual experience whether the injury complained of is irremediable. When the truth is demonstrable, why should the matter be left to the conflicting opinions of witnesses? Enough is shown to make it reasonably certain that Democrat gulch, 10 feet in width and 3 feet deep, with a minimum grade of between 7 and 8 feet in a half mile, will carry

the water coming from defendant's mine and the water otherwise ordinarily flowing therein, and it is unlikely that there will be any such subirrigation as will flood the adjacent lands in the way complained of.

The preponderance of the evidence from inspection of the ground is against the claim of injury and damage. But without this, the refusal of the plaintiff to permit the defendant to build levees along the ditch, to improve and keep it in repair, is unreasonable. His demand that the operation of the mine shall be enjoined, as the only measure of relief with which he will be satisfied, is under the circumstances inequitable. This court cannot thus destroy the defendant's property unless there is imperative necessity therefor. If, the opportunity being offered, the defendant refuses to build necessary levees along the ditch, or refuses to maintain the ditch in a state of repair, or, having done so, if these measures are inadequate to prevent injury and damage to the plaintiff, it may then become the duty of the court to grant such relief as is prayed for.

The plaintiff, upon the facts appearing, is not entitled to such relief, and the bill of complaint is dismissed.